**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| DISTRO SYSTEMS LLC,<br>a Michigan Limited Liability Company,<br>2222 Abbey Lane<br>Dearborn, MI 48124<br><br><br>Plaintiff,<br><br>Against<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,<br>20 Massachusetts Ave NW,<br>Washington DC 20529<br><br><br><br>Defendant. | Case No.:<br><br><br>COMPLAINT |

## **I. INTRODUCTION**

1. This is an action brought under the Administrative Procedure Act seeking to have the United States Citizenship and Immigration Services' decision denying DISTRO SYSTEMS, LLC (DISTRO SYSTEMS)' petition to classify VENKATA KASAVAJHULA as a specialty occupation worker held unlawful and set aside. As will be shown the decision ignored critical evidence and misstated both the law and the record in coming to its arbitrary and legally erroneous conclusions. In particular it grossly misconstrued the job as falling into an occupation which does not exist merely because the Department of Labor's labor condition application did not provide sufficient space to permit S.O.C. of the actual occupation to be written there and ignored the petitioner when it corrected its simplistic error. Further, it demonstrated that it failed to understand

1

the purpose of expert opinion by rejecting it for failing to engage in independent fact finding even though it was not submitted for that purpose and confused two different standards for establishing that a job is a specialty occupation with each other.

## II. PLAINTIFF

2. Distro Systems, LLC, was established in 2011 and is based in Dearborn, Michigan. Distro Systems is an IT services and solution provider. Additional information about Distro Systems, LLC is available on its website at www.distrosystems.com

## III. DEFENDANT

3. The defendant, United States Citizenship and Immigration Services (USCIS), is an agency of the United States government residing in the District of Columbia.

## IV. JURISDICTION

4. This being a civil action against the United States arising under the Immigration and Nationality Act, 8 U.S.C. § 1101, *et. seq.,* and the Administrative Procedure Act, 5 U.S.C. § 701, *et. seq.,* both laws of the United States, original jurisdiction over this matter is vested in this Court by 28 U.S.C. § 1331.

## V. STANDING

5. DISTRO SYSTEMS has a legally protected interest in a decision by the USCIS on its petition upon Mr. Kasavajhula's behalf which is not arbitrary and capricious, nor an abuse of discretion, and which is in accordance with law, per 5 U.S.C. § 706(2), and the invasion of this right has caused it concrete and particularized injury in that, as a result of this invasion, DISTRO

SYSTEMS can no longer employ Mr. Kasavajhula, and, therefore, cannot derive the revenue it previously received from the sale of his services to its client;  (2) there is a causal connection between the injury-in-fact and the defendant's challenged behavior in that it is precisely the defendant's denial of Distro's petition that has caused DISTRO SYSTEMS to sustain this loss and (3) it is reasonably certain that the injury-in-fact will be redressed by a favorable ruling in that an approval of Distro's petition will qualify Mr. Kasavajhula to apply for an H-1B visa with which he can return to the United States to be  employed by Distro.  Accordingly, DISTRO SYSTEMS has standing to complain of this action. *Lujan v. Defs. of Wildlife*, *504 U.S. 555, 560-61 (1992).*

## VI. VENUE

6. Pursuant to 28 U.S.C. § 1391(e), venue is proper in the District of Columbia, where the defendant resides.

## VII. BRIEF STATEMENT OF PROCEDURAL HISTORY AND LEGAL BACKGROUND

7. On or about April 12, 2018 the plaintiff, DISTRO SYSTEMS, filed a Petition for a Nonimmigrant Worker (Form I-129), with U.S. Citizenship and Immigration Services (USCIS), seeking to classify Venkata Kasavajhula , as a temporary worker in a specialty occupation (H-1B) under section 101(a)(l5)(H)(i)(b) of the Immigration and Nationality Act (INA), and, concurrently, a change of Mr. Kasavajhula's nonimmigrant status in the U.S. from F-1 (foreign student) to H-1B (specialty occupation worker). Its petition contained an offer to Mr. Kasavajhula of a job entitled "Associate-Technology Practice" in which he would perform the following duties:

- Work on implementing enhancement features to the BCBSM native hybrid app (iOS and Android).

- Writing code in Ionic and Angular JS, using cordova plugins and collaborating

with the Desktop team to ensure seamless working of the mobile app.

• Apply working knowledge of Water Fall and Agile Scrum methodologies, and Eclipse and IntelliJ IDEs.

• Attend daily Stand-Up meeting , Sprint planning sessions, Grooming sessions (reviewing the upcoming tasks) and also Story-Sizing se ion (sizing individual tasks as a team, based on complexity).

• Resolve Desktop application issues, in Spring MVC (J2EE).

• Ensure features of web application work for mobile as well, without having to implement redundant logic.

• Deploy builds in WebLogic Application Server.

• Write Impact Analysis and Test cases for assigned tasks.

• Assist with App version releases, SIT (System Integration Testing), and QA testing of the App.

• Use BitBucket Git Repository for version control, JIRA and Confluence for Project Management.

8. These duties would be performed in a Technical Environment which consisted of SQL Server, TOAD, Shell, Python, VBA, Jenkins, Cucumber, JIRA, Bug host, Rally, HTML, XML, JavaScript. The petition included a diploma and transcript reflecting Mr. Kasavajhula's Master of Science degree in Applied Computer Science from Northwest Missouri State University.

9. On approximately December 26, 2018, in response to a request for additional evidence from the USCIS, Distro provided it with an estimate of the percentage of the time Mr. Kasavajhula

would spend performing each of these duties. It also pointed out that the job offered fell within the occupation of Computer Systems Engineers/ Architects.

10. Additionally, it included among other documents, a letter and C.V. from Stan J. Thomas, Ph.D., Professor of Computer Science, Wake Forest University, an expert in the field of computer science and information systems, confirming the position is a specialty occupation, and that the nature of the position offered Mr. Kasavajhula is so specialized and complex that only an individual with a bachelor's degree in computer science or a related field would be able to perform the job duties.

11. In this letter Dr. Thomas offered the following summary of his qualifications in field of computer science:

> I received a Baccalaureate degree in Mathematics from Davidson College in 1974 and a doctorate in Computer Science from Vanderbilt University in 1983. Since 1983 I have served primarily on the Computer Science faculty of Wake Forest University where I served as department chair from 2004 to 2011. I also served as a Computer Science faculty member at Vanderbilt University, University of Tennessee (Nashville), the United States Air Force Academy and Lahore University of Management Science, Lahore, Pakistan. At Wake Forest University, I led in the development of both undergraduate and graduate programs and have actively participated on many university and school wide committees. I have served as director of the department's graduate program, evaluating educational transcripts from universities outside the United States submitted by applicants to our graduate program. I have authored and co-authored numerous research papers in Computer Science published in highly competitive publications or presented in high profile conferences. I have also served as a software developer and consultant in the transportation industry, as a visiting scholar with NASA, and as an expert legal witness.
>
> Since 1995 I have been actively involved as a volunteer expert and consultant with ABET, the leading international accrediting body for academic Engineering and Technology programs. From 2005 to 2016 I served as a commissioner on the Computing Accreditation Commission of ABET, serving as the computing commission chair from 2014 to 2015. In my volunteer work with ABET, I have been responsible for conducting reviews of numerous computer science, information science, information technology, and similarly-named computing programs around the globe, including programs in Egypt, the Philippines, Saudi Arabia, Canada, and the United States. On the basis of my experience and qualifications, I can be considered an authority on education matters in the computing related specialty fields. The IEEE - Institute of Electrical and Electronics Engineers Computer Society (https://www.computer.org/web/about/) and ACM -

Association for Computing Machinery (https://www.acm.org/about-acm/about-the-acm-organization) are well-respected and internationally recognized professional societies that promote the advancement of computing and technology. As a Life Senior member of the IEEE-CS and four decade member of the ACM, I am very familiar with the efforts of these professional organizations to identify the educational requirements for software developers and similar technical professionals. For example, the ACM and IEEE-CS recently created revised guidelines for Computer Science Curricula (https://www.acm.org/binaries/content/assets/education/cs2013 _ web _final.pdf) · published December 2013 by the ACM-IEEE-CS Joint Task Force on Computing Curricula-making clear the need for a focused Bachelor's education for individuals preparing for work in the software development and information technology areas. In my work with the Computing Accreditation Commission of ABET I have had a leadership role in applying these curriculum guidelines to the accreditation criteria for computing programs.

12. After carefully reviewing in detail the duties of the position offered to Mr. Kasavajhula, Dr. Thomas made the following comments regarding the qualifications needed to perform this position:

> It is clear that a minimum of a Bachelor's degree in computer sciences or related field provides an individual with the core competencies and skills needed for the role. This is because the nature of these specific responsibilities and knowledge is so specialized that the knowledge required to perform these duties is usually associated with the attainment of a minimum of a baccalaureate degree in a computing related discipline. The O*NET guidance for this occupation states that "Most of these occupations require a four-year bachelor's degree, but some do not." For this Associate -Technology Practice position at Distro, which requires not only technical knowledge but also professional socialization, including skilled technical communication skills, I cannot envision the hiring of an individual without a four-year Bachelor's degree in computer sciences or related field. These majors provide a strong technical foundational core, require an aptitude for systems analysis, documentation, problem solving and algorithm development, and require studies in quantitative analysis and both hardware and software topics. It is true that some of these programming skills associated with the position may be learned in a two-year associate degree program. However, such programs do not teach students the conceptual and theoretical topics needed to continue to adapt to new problems and new environments. Furthermore, the combination of skills required for this position require the Beneficiary to know web development, web protocols, software testing, and software quality assurance topics, as well as communication skills. Such a diverse yet interconnected range of topics is not learned in two-year degree programs. The knowledge to successfully complete these tasks is gained in a university program of study leading to a minimum of a Bachelor's degree in computer sciences or related field.

    For example, at Wake Forest University, the Computer Science degree program includes the following courses which are relevant to this position: Introduction to Computer Science (Java), Fundamentals of Computer Science (C++), Web Development, Computer Organization, Data Structures and Algorithms I & II, Programming Languages, Computer Systems, Database Management, Software Engineering, Systems Analysis, Operating Systems, Internet Protocols, Computer Networks, Computer Security (http://college.wfu.edu/cs/undergraduate-program/requirements-for-the-computer-science-maior. The technical skills acquired in a Baccalaureate degree with the above listed coursework would provide a person with the foundational skills necessary for entry into the proffered position from Distro. Again, these skills are normally obtained through a minimum of a Bachelor's degree in computer sciences or related field. It is highly unlikely that such a position would be offered to someone without this type of education.

13. Accordingly, Dr. Thomas concluded that:

    The position of Associate - Technology Practice offered to Mr. Kasavajhula is a specialty occupation as defined under 8 C.F.R. 214.2(h)(4)(ii) requiring theoretical and practical application of a body of highly specialized knowledge, a Bachelor's degree in computer sciences or related field, and meets sufficient criteria for a specialty occupation under 8 C.F.R. 214.2(h)(4)(I)(A). In addition, I conclude that the nature of the position is so specialized and complex that only an individual with a minimum of a Baccalaureate degree would be able to perform the job duties.

14. Nevertheless, on January 14, 2019, the USCIS issued the decision denying Distro's petition upon Mr. Kasavajhula 's behalf, as well as his application to change his nonimmigrant status to H-1B.

15. In that decision the USCIS stated that it "recognizes the Occupational Outlook Handbook (the OOH), a publication of the US Department of Labor (DOL), as an authoritative source on the duties and education and requirements of the wide variety of occupations that it addresses". However, it concluded that the job offered did not qualify as a specialty occupation because "you provided a certified labor condition application (LCA) from the DOL that the proffered position is a position within the computer occupation, all other category. The OOH does not contain detailed profiles for the computer occupation, all other categories".

7

16. The decision ignored Distro's assertion that the job offered actually fell into the occupation of Computer Systems / Architect and made no investigation of whether OOH contained a detailed profile for that occupation. Further, it disregarded Dr. Thomas's expert opinion because "Given the professor's limited review of the duties of the position, based largely on the job description provided by you, USCIS gives less weight to the professor's opinion. The evidence does not distinguish the difference between the duties to be performed by the beneficiary and those normally performed by similar workers, and how the duties of the proffered position are more specialized and complex."

## VIII. CAUSE OF ACTION

17. 5 U.S.C. § 706 provides in material part that: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an Agency action. The reviewing court shall--

…

(2)  hold unlawful and set aside Agency action, findings, and conclusions found to be--

(A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### COUNT I

**THE DECISION WAS ARBITRARY BECAUSE IT IS SQUARELY CONTRADICTED BY THE EVIDENCE IN THE RECORD.**

18. USCIS regulations offer four different means by which a petitioner may establish that the proffered position is a specialty occupation. One of these, 8 CFR 214.2(h)(4)(iii)(A)(1),

provides in relevant part that "To qualify as a specialty occupation, the position must meet one of the following criteria: … A baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular position; …"

19. The decision itself indicated in its discussion of this issue that "USCIS recognizes the Occupational Outlook Handbook (the OOH), a publication of the US Department of Labor (DOL), as an authoritative source on the duties and education and requirements of the wide variety of occupations that it addresses". However, it concluded that the job offered did not qualify as a specialty occupation under this criterion solely because "you provided a certified labor condition application (LCA) from the DOL that the proffered position is a position within the computer occupation, all other category. The OOH does not contain detailed profiles for the computer occupation, all other categories".

20. The USCIS's conclusion the proffered is not a specialty occupation because "the OOH does not contain detailed profiles for the computer occupation, all other category" is squarely contradicted by the record because the O*Net itself states unequivocally that Computer Occupations, All Others, is not an occupation at all but rather, that "'All Other' titles represent occupations with a wide range of characteristics which do not fit into one of the detailed O*NET-SOC occupations."

21. In fact, the O*Net lists at least 12 occupation which fall within the "computer occupations, all others" category, one of which,15-1199.02, Computer Systems Engineers/Architects was expressly identified by the petitioner as being the specialty occupation into which the job offered falls. The decision nevertheless misconstrued the job offered as being

9

in the non-existent occupation of "Computer Occupations, All Others" merely because the labor condition application form created by the Department of Labor does not provide a place for petitioners to enter the full occupational code, but rather limits it to 6 digits. Amazingly, the agency persisted in its simplistic error in its decision even after the petitioner pointed out in response to the request for evidence that the job in fact fell within SOC 15-1199.02, not 15-1199.

22. Further, the job offered is in fact consistent with the occupation of Computer Systems Engineers/Architects because the Department of Labor supported "O*Net" provides that Computer Systems Engineers/Architects "Design and develop solutions to complex applications problems, system administration issues, or network concerns. Perform systems management and integration functions."

23. Note that the word "or" demonstrates that the job of computer systems engineer/architect need only involve one of the three task areas mentioned in the first sentence. Here at least 71% of the duties of the job offered involve the design and development of solutions to complex application problems, such as:

- Work on implementing enhancement features to the BCBSM native hybrid app (iOS and
- (Android). (17%)
- Writing code in Ionic and Angular JS, using cordova plugins and collaborating with the Desktop team to ensure seamless working of the mobile app. (27%)
- Resolve Desktop application issues, in Spring MVC (J2EE). (17%)
- Ensure features of web application work for mobile as well, without having to implement
- redundant logic. (10%)

24. Accordingly, the USCIS's conclusion that the job offered was not classifiable as a specialty occupation under 8 CFR 214.2(h)(4)(iii)(A)(1) solely because the Occupational Outlook Handbook did not contain detailed profiles for the computer occupation, all other category was arbitrary in that it was squarely contradicted by at least 2 facts from the record: 1) "Computer

Occupations All Others" is not an occupation and 2) the job offered in fact fell into the Computer Engineers/ Architect occupation.

## COUNT II

**THE DECISION WAS ARBITRARY BECAUSE IT IGNORED CRITICAL EVIDENCE IN THE RECORD**

25. As shown above, the job description set forth in the O*Net for computer systems engineers/architects is "Design and develop solutions to complex applications problems, system administration issues, or network concerns. Perform systems management and integration functions" and the job offered falls within that description because it primarily involves that the design and development of complex applications problem." This makes the duties of the job offered virtually identical to those of a software developer as described in the Occupational Outlook Handbook, which states that "some (software developers) develop the applications that allow people to do specific tasks on the computer or another device." https://www.bls.gov/ooh/computer-and-information-technology/software-developers.htm.

26. The OOH further states that "Software developers usually have a bachelor's degree, typically in computer science, software engineering, or a related field."[1]

27. Usually is a synonym of normally.[2] So is typically.[3] Therefore the OOH demonstrates that

---

[1] https://www.bls.gov/ooh/computer-and-information-technology/software-developers.htm#tab-4

[2] http://www.merriam-webster.com/dictionary/normally. Also: The word "normally" means "commonly, usually ... in normal circumstances ... under normal conditions...." Webster's Third New International Dictionary 1540 (unabridged ed. 1986). "usual is defined as "accordant with usage, custom, or habit : normal" http://www.merriam-webster.com/dictionary/usually?show=0&t=1318604406

[3] Dictionary.com, http://dictionary.reference,com/browse/typical (accessed: June 29, 2012).

the offered position qualifies as a specialty occupation under 8 CFR § 214.2(h)(4)(iii)(A)(1) because "(a) baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular position."

28. Accordingly the decision was arbitrary because it ignored critical evidence that the job offered fell within the software developer occupation[4] and that the OOH provided that software developer is a specialty occupation

## COUNT III

**THE AGENCY DECISION WAS ARBITARY BECAUSE IT REFUSED TO CONSIDER THE EXPERT'S OPINION**

29. The USCIS did not dispute that Dr. Thomas qualified as an expert in the field of computer science. Nevertheless, it refused to consider his opinion because: 1) he did not engage in independent fact finding regarding the duties of the position; 2) his "opinion is not supported by copies or citations of research material that 'may' have been used"; 3) He "has not provided sufficient facts that would support the contention that the proffered position requires at least u bachelor's degree or higher or its equivalent in a specific" and 4)"The evidence does not distinguish the difference between the duties to be performed by the beneficiary and hose normally performed by similar workers and how the duties of the proffered position are more specialized and complex." None of these are rational explanation for refusing to consider the expert's opinion.

   1)   First, it is simply irrelevant, and reflects a fundamental misunderstanding of the role of an expert to refuse to consider his testimony merely because he relied upon the job description provided by the employer and did not engage in independent fact-finding. The expert's testimony was proffered precisely for the purpose of establishing that the duties of the job offered,

---

[4] As can be seen, the software developer occupation overlaps with the Computer Systems/Architects occupation.

as described by the employer, required a specialized degree. Therefore, disregarding an expert's opinion because he did not engage in independent fact finding was irrational

2), the expert did cite to such research materials as he relied upon, namely the Computer Science curriculum for Wake Forest University at (http://college.wfu.edu/cs/undergraduate-program/requirements-for-the-computer-science-major. However, as his opinion made clear, he did not base his opinion primarily upon research materials, but rather "my qualifications and analysis of the available documentation" Id. An expert has "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or determine a fact in issue" *Matter of D-R-, 25 I&N Dec. 445, 459 (BIA 2011)*. Here the USCIS never disputed that Dr. Thomas in fact had scientific, technical or other specialized knowledge in the field of Computer Science and therefore was entitled to rely upon that knowledge, rather than specific research materials in coming to his conclusions; 3) The claim that Dr. Thomas "has not provided sufficient facts that would support the contention that the proffered position requires at least a bachelor's degree or higher or its equivalent in a specific occupation" is arbitrary because it is conclusory. *Tourus Records, Inc. v. DEA*, 347 *U.S. App. D.C. 262, 259 F.3d 731, 737 (2001)* (holding that a "fundamental" requirement of administrative law is that an agency "set forth its reasons" for decision; an agency's failure to do so constitutes arbitrary and capricious agency action.. ...The DEA's letter denying Tourus' petition to proceed in forma pauperis does not meet the APA standard. The letter says nothing other than that the 'Affidavit of Indigency you submitted in lieu of a cost bond is not adequately supported.' Resp't App. at 18. That is not a statement of reasoning, but of conclusion. It does not 'articulate a satisfactory explanation' for the agency's action',,,,, because it does not explain 'why' the DEA regarded Tourus' affidavit as unsupported,".) (internal citations omitted).. So too the unadorned assertion that Dr. Thomas had

not provided "sufficient facts" in support of his opinion is as conclusory and therefore arbitrary as a claim that an affidavit of indigency "is not adequately supported"; 4) The requirement that the expert opinion distinguish the difference between the duties to be performed by the beneficiary and those normally performed by similar workers and how the duties of the proffered position are more specialized and complex" is irrational because there is no requirement that the expert distinguish between the duties of the proffered position and those of similarly employed workers in order to establish that the duties of the job are so complex as to require a specialized degree and so that the job is a specialty occupation under 8 CFR § 214.2(h)(4)(iii)(A)(4). In fact, it is apparent that the USCIS is conflating that requirements of this criterion with that of criterion 2, which provides that an employer may establish that a job is a specialty occupation if "its particular position is so complex or unique that it can be performed only by an individual with a degree;", 8 CFR §  214.2(h)(4)(iii)(A)(2). There is no requirement in § 214.2(h)(4)(iii)(A)(4) that the job offered be "unique" and therefore no reason why it should be distinguishable from the job of others similarly employed. Indeed, the fact that the Secretary of Homeland Security inserted the requirement that the job be "unique" in criterion 2 is compelling evidence that it is not a requirement for criterion 4. "[w]here Congress includes particular language in one section of a statute but omits it from another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, *464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983)*. as "we look to general rules of statutory construction to interpret and analyze the pertinent regulations", *Matter of H-N, 22 I. & N. Dec. 1039, 1041 (B.I.A. October 13, 1999)*.

30. Accordingly, the USCIS disregard of the expert's opinion in coming to the conclusion that the petitioner did not establish that the job offered constituted a specialty occupation under 8 CFR § 214.2(h)(4)(iii)(A)(4) was both arbitrary and not in accordance with law.

WHEREFORE, inasmuch as the all the bases for the denial of the Distro's petition upon Mr. Kasavajhula were either arbitrary and/or not in accordance with law it is respectfully requested that this Court hold unlawful and set aside the decisions denying Distro's petition for a nonimmigrant visa on Mr. Kasavajhula 's behalf.

Respectfully submitted this 26th day of May, 2019

*s/Michael E. Piston*
Michael E. Piston (MI 002)
Attorney for the Plaintiffs
225 Broadway, Ste 307
New York, NY 10007
646-845-9895
michaelpiston4@gmail.com